Donald DEMPSEY, et al., Appellants,

v.

APACHE SHORES PROPERTY OWNERS ASSOCIATION, INC., Appellee.

No. 14555.

Court of Appeals of Texas,
Austin.

Aug. 12, 1987.

Rehearing Denied Oct. 14, 1987.

Jay A. Thompson, Clark, Thomas, Winters & Newton, Austin, for appellants.

James O. Guleke, II, Daugherty, Kuperman, Golden & Morehead, Austin, for appellee.

Before GAMMAGE, ABOUSSIE and SMITH *, JJ.

GAMMAGE, Justice.

This is an appeal from a permanent injunction prohibiting Donald Dempsey and Village Homes, Inc. (referred to collectively as "Dempsey") from placing mobile homes in the Apache Shores Subdivision on any lots except those where mobile homes are expressly permitted by the restrictive covenants. The injunction order was signed following a jury trial at which the jury found that Dempsey intended to place mobile homes on lots where mobile homes are not permitted and that the restrictions were neither waived nor subject to estoppel, laches or changed conditions. We will affirm the judgment.

Apache Shores is a subdivision in northwest Travis County which consists of approximately 2,460 lots divided into seven sections. Only about 424 lots were im-

---

* Before Earl W. Smith, Justice (retired), Third Court of Appeals, sitting by assignment. *See* Tex.Gov't Code § 73.012 (Supp.1987).

proved at time of trial. Declarations of restrictions were duly filed between 1968 and 1972 requiring, *inter alia,* single family dwellings with minimum living space of 650 square feet in sections one through five and 1200 square feet in sections six and seven. All the sections, except certain specified lots in sections three and five, have restrictions against "mobile homes, house trailers, tents, shacks, and other similar structures." The Apache Shores Property Owners Association, Inc., by grant from the original developer, has the right to approve building plans and to enforce restrictive covenants.

Dempsey and his wife own all the stock in Village Homes, Inc., a retailer of "mobile, manufactured and modular homes." By three separate transactions, Dempsey individually purchased approximately 563 lots from Apache Shores, Inc., the original developer. Each of the three earnest money contracts, executed September 5, 1983, November 18, 1983, and March 10, 1984, expressly provided the lots purchased by Dempsey were to be used "for modular or mobile homes." There is no evidence that the property owners knew the earnest money contracts between Dempsey and the developer contained this provision.

In October 1983, representatives of Dempsey and Village Homes attended a meeting of the Board of Directors of Apache Shores Property Owners Association, Inc. to present a slide show concerning the types of manufactured housing which Dempsey planned to place in the subdivision. The property owners did not object at that time; however, there is evidence in the record that Dempsey's representative was provided a copy of the restrictive covenants and that he agreed at the directors meeting that Dempsey would comply with those covenants. Property owners testified they assumed Dempsey planned to place the manufactured homes only on those lots where mobile homes are expressly permitted.

In April or May of 1984, the Property Owners Association began receiving calls from property owners complaining that Dempsey was moving double-wide trailers into non-mobile home sections of the subdivision. In June 1984, the Property Owners Association refused to approve plans for the double-wide mobile homes. Dempsey insisted on placing the double-wide units on lots where mobile homes were prohibited, and the Property Owners Association filed suit to enforce the restrictive covenants on July 25, 1984.

In points of error one, two and four, Dempsey argues essentially that the trial court's judgment, based upon the jury's answers to special issues, is erroneous because "double-wide manufactured" homes are not "mobile" homes within the meaning of the restrictive covenants. He argues the term "mobile home" is ambiguous because the Texas Legislature amended its definition of "mobile home" after the covenants were recorded to distinguish "manufactured homes," "modular homes," and later "industrialized housing," from "mobile homes." Tex.Rev.Civ.Stat.Ann. art. 5221f (Supp.1987). He argues further that any ambiguity should be resolved in favor of the unrestricted use of real property, *Baker v. Henderson,* 153 S.W.2d 465, 470 (Tex.Comm.App.1941, opinion adopted), because advances in technology and increased regulation of the mobile home industry have rendered today's double-wides beyond the possible realm of contemplation of the covenant drafters.

Dempsey argues that mobile homes, as they existed when the covenants were drafted between 1968 and 1972, were twelve feet wide and forty to sixty feet long with metal or aluminum siding and a flat metal roof. The undercarriage, wheels and axles on these mobile homes were designed to be permanent parts of the structure and almost always stayed with the home. By contrast, he claims the homes he plans to place in the subdivision are larger, heavier, better constructed and have optional siding and roofing materials and other amenities that make the double-wide look more like a site-built house.

■ Dempsey argues that because of the improvements in quality and appearance of today's double-wides, the reasons for the prohibition in the restrictive cove-

nants no longer obtain and this Court should construe the covenant language strictly so as to exclude double-wide "manufactured" or "modular" homes from its ambit. Restrictive covenants, however, are strictly construed in favor of the grantee only when the intent of the parties is not ascertainable from the language of the covenant, and an unambiguous restriction will be enforced as written. *Curb v. Benson*, 564 S.W.2d 432, 433 (Tex.Civ.App.1978, writ ref'd n.r.e.); *Walker v. Dorris*, 206 S.W.2d 620, 623–24 (Tex.Civ.App.1947, writ ref'd n.r.e.).

Our first task then is to determine if the language of the covenant is ambiguous. Ambiguity exists if the provision is susceptible to two or more meanings so that the intention of the parties cannot be determined. *Memorial Hollow Architectural Control Committee v. Mapes*, 610 S.W.2d 230 (Tex.Civ.App.1980, no writ). We must look to the common and ordinary meaning of the term "mobile home" as of the date the covenant was drafted to determine if a prospective purchaser would necessarily be on notice that double-wide "manufactured" or "modular" homes are prohibited. *See Davis v. Huey*, 620 S.W.2d 561, 567 (Tex. 1981).

It is unclear whether double-wides were in common use when the covenants were drafted between 1968 and 1972, but that is not dispositive of our inquiry. A double-wide unit is simply two single-wide units bolted together with siding material applied to the exterior to cover the seam. Dempsey argues that these are no longer "mobile homes" because they have been statutorily defined as "manufactured" and "modular" homes. He contends that because of increased regulation which resulted in improved quality, these statutorily defined units ceased being simply two mobile homes joined together, but somehow have evolved into a new species of housing unit completely distinct, as a matter of law, from "mobile homes." He argues that, at the very least, the statutory definitions create an ambiguity in the term "mobile home" which should be resolved in his favor because the law favors unrestricted use

of real property. *Baker v. Henderson, supra.*

At the time the restricted covenants were drafted, there was statutorily only the "mobile home." When the need became apparent, legislation was enacted to protect consumers and the terms "manufactured homes," "modular homes" and later "industrialized housing" were employed by the legislature as part of its regulatory scheme. "Manufactured homes" are built in accordance with federal regulatory standards, 42 U.S.C.A. § 5401, *et seq* (West 1983 & Supp.1987), and "modular homes", now called "industrialized housing," are built according to state standards. Tex. Rev.Civ.Stat.Ann. arts. 5221f and 5221f–1 (Supp.1987). The differences between the two are technical and minor.

As it currently reads, the Manufactured Housing Standards Act defines "mobile" and "manufactured" homes as follows:

Sec. 3.... (a) "Mobile home" means a structure that was constructed before June 15, 1976, transportable *in one or more sections*, which, in the traveling mode, is eight body feet or more in width or 40 body feet or more in length, or, when erected on site, is 320 or more square feet, and which is built on a permanent chassis and designed to be used as a dwelling *with or without a permanent foundation* when connected to the required utilities, and includes the plumbing, heating, air-conditioning, and electrical systems.

\* \* \* \* \* \*

(s) "Manufactured housing" or "manufactured home" means a HUD-code manufactured home *or a mobile home* and collectively means and refers to both.

\* \* \* \* \* \*

(u) "HUD-code manufactured home" means a structure, constructed on or after June 15, 1976, according to the rules of the United States Department of Housing and Urban Development, transportable *in one or more sections*, which, in the traveling mode, is eight body feet or more in width or 40 body feet or more in length, or, when erected on site, is 320 or more square feet, and which is built

on a permanent chassis and designed to be used as a dwelling *with or without a permanent foundation* when connected to the required utilities, and includes the plumbing, heating, air-conditioning, and electrical systems.

Tex.Rev.Civ.Stat.Ann. art. 5221f (Supp. 1987) (emphasis added). "Industrialized housing" is defined as follows:

"Industrialized housing" means a residential structure that is designed for the use and occupancy of one or more families, that is constructed in one or more modules or constructed using one or more modular components built at a location other than the permanent residential site, and that is designed to be used as a permanent residential structure when the modules or modular components are transported to the permanent residential site and are erected or installed on a permanent foundation system....

Tex.Rev.Civ.Stat.Ann. art. 5221f–1 § 1(1) (Supp.1987).

■ Dempsey has failed to convince this Court that these "manufactured", "modular" or "industrialized" homes cannot still be "mobile" homes within the meaning of the Apache Shores restrictive covenants. Article 5221f lends little support to Dempsey's argument because § 3(s) explicitly states that "mobile homes" may be referred to as "manufactured homes," thereby blurring the distinct line Dempsey attempts to draw. In addition, there is no specific language in either statute from which one could reasonably infer an intent by the legislature to subvert the express language of a restrictive covenant such as the one at issue. On the contrary, art. 5221f § 4A provides: ... "This section shall not affect the validity of any deed restriction that is otherwise valid."

The covenant drafters had no way to predict these subsequent technical statutory distinctions, and the language they chose should be viewed in that light. The covenants expressly prohibit "mobile homes." Double-wide units, whether they be "manufactured," "modular" or "industrialized," are still referred to in common parlance as "mobile homes." Dempsey himself admitted that he often refers to double-wides as "mobile homes," and evidence was presented that Village Homes advertises double-wides under the heading "Mobile Homes—Brokers" in the yellow pages of the Southwestern Bell Telephone Directory. Double-wides were considered "mobile homes" at the time the covenants were drafted and the jury found, based on considerable evidence, that despite improvements in quality and appearance, they are still "mobile homes" today. We cannot say that finding is legally or factually erroneous.

Subsequent statutory definitions based on technical distinctions for the purpose of safety regulation did not, as a matter of law, create ambiguity in the language of the previously-drafted restrictive covenant. Article 5221f and art. 5221f–1 were intended to protect consumers, *see* art. 5221f § 2, not to divest property owners who purchased in reliance upon the restrictions of their right to enforce the covenants. Restrictive covenants would be rendered meaningless if they could be implicitly subverted by legislatively changing the name of that which is prohibited.

Because we hold that the covenant is unambiguous, we need not speculate about the intent of the drafters. Were we to find otherwise, however, we cannot agree with Dempsey's additional argument that the covenant should be construed in his favor because any reason the drafters may have had for creating the restriction no longer obtains. Evidence was presented that no matter how attractive they are, mobile homes can have a negative impact on neighboring property values. Moreover, many of the options available to make the double-wide units look more like site-built houses are not statutorily required. Although Dempsey claims the units he proposes to place in the subdivision are of superior quality and appearance, evidence was presented that double-wide "manufactured" and "modular" homes may still be purchased with flat roofs, metal siding, and other features typically characteristic of single-wide mobile homes and which neighboring property owners could find aestheti-

cally displeasing. Were we to accept Dempsey's construction of the restrictive covenant, the Apache Shores subdivision would be open not only to the units Dempsey proposes, but also to less attractive structures which meet the technical statutory definitions for "manufactured," "modular" or "industrial" housing.

Our holding that a double-wide "manufactured" or "modular" home is a "mobile home" within the meaning of the Apache Shores restrictive covenant has support in prior caselaw. The Texas Supreme Court has held that a single-wide mobile home is a "trailer" within the meaning of a restrictive covenant, *Lassiter v. Bliss,* 559 S.W.2d 353 (Tex.1977), relying in part on the reasoning enunciated in *Bullock v. Kattner,* 502 S.W.2d 828 (Tex.Civ.App.1973, writ ref'd n.r.e.), and *Phillips v. Zmotony,* 525 S.W.2d 736 (Tex.Civ.App.), *rev'd* 529 S.W.2d 760 (Tex.1975).[1] Citing *Lassiter, Bullock* and *Phillips,* the Tyler Court of Appeals has held that double-wide manufactured homes are prohibited by a covenant restricting "any kind of mobile home." *Gigowski v. Russell,* 718 S.W.2d 16 (Tex. App.1986, writ ref'd n.r.e.). In a more recent opinion, the Supreme Court held that a double-wide mobile home with an attached porch violated a deed restriction prohibiting "house trailers." *Wilmoth v. Wilcox,* 734 S.W.2d 656 (Tex.1987). The facts in *Gigowski* and *Wilmoth* are strikingly similar to the facts before us, and the reasoning in those cases applies equally to this appeal. *See also, Curb v. Benson, supra.* Dempsey's first, second and fourth points of error are overruled.

■ In his third point of error, Dempsey argues the trial court erred in failing to instruct the jury that deed restrictions must be strictly construed against the plaintiff and in favor of the free and unencumbered use of the property. The trial court, however, has broad discretion in deciding what instructions are necessary and proper in submitting issues to the jury. Tex.R.Civ.P.Ann. 277 (Supp.1987); *Union Oil Company of California v. Richard,*

536 S.W.2d 955, 957 (Tex.Civ.App.1975, writ ref'd n.r.e.). It is not an abuse of that discretion for the trial court to refuse to include in its charge a requested instruction which is an abstract statement of the law and is not necessary to enable the jury to pass upon an issue. *King v. King,* 242 S.W.2d 925, 932–33 (Tex.Civ.App.), *rev'd on other grounds,* 244 S.W.2d 660 (Tex.1951); *Samsel v. Diaz,* 659 S.W.2d 143, 144 (Tex. App.1983, no writ); *First State Bank & Trust Co. of Edinburg v. George,* 519 S.W.2d 198, 207 (Tex.Civ.App.1974, writ ref'd n.r.e.).

■ The instruction was requested in connection with the following special issue:

> Do you find by a preponderance of the evidence that Mr. Dempsey and/or Village Homes, Inc. are intending to place mobile homes on lots in each of the seven sections of the Apache Shores subdivision that are not designated for mobile homes or house trailers?

The rule of strict construction stated in Dempsey's requested instruction is a correct statement of the law, but it applies only when the covenant is ambiguous and the intent of the parties is not ascertainable from the terms of the covenant. *Curb v. Benson, supra; Atkins v. Fine,* 508 S.W.2d 131, 133 (Tex.Civ.App.1974, no writ). Because we hold that the covenant is unambiguous and the intent of the drafters is ascertainable from the four corners of the instrument, the instruction requested by Dempsey is an abstract statement of the law which was unnecessary to the jury's determination. Consequently, any error which the trial court may have committed in refusing the instruction is harmless and not reversible error. Tex.R.App. P.Ann. 81(b)(1) (Supp.1987). Dempsey's third point of error is overruled.

By points of error five through nine, Dempsey argues that the evidence supporting the jury's answers to special issues concerning the defenses of waiver, changed conditions, estoppel and laches is legally and, alternatively, factually insufficient.

---

1. The Supreme Court reversed the Court of Civil Appeals in *Phillips* because the evidence raised the question of whether the covenant had been waived.

Dempsey argues the mobile-home restrictions have been waived or are unenforceable on the basis of estoppel or laches because: the home owners association has allowed other property owners to place double-wides on non-mobile home lots in Apache Shores; no objections were raised by property owners at the board meeting at which Dempsey's representatives presented a slide show concerning the type of homes manufactured by Palm Harbor; Dempsey purchased additional lots after the board meeting; and Dempsey began construction of septic systems on a number of the lots in reliance upon the property owners' implied approval.

## WAIVER

■ In order to establish waiver, Dempsey had the burden of proving that the Property Owners Association voluntarily and intentionally relinquished its right to enforce the restrictive covenants. *Massachusetts Bond. & Ins. Co. v. Orkin Exterm. Co.*, 416 S.W.2d 396, 401 (Tex.1967); *Farmer v. Thompson*, 289 S.W.2d 351, 356 (Tex.Civ.App.1956, writ ref'd n.r.e.). To carry that burden, Dempsey must prove the violations then existing were so extensive and material as to reasonably lead to the conclusion that the restrictions had been abandoned. *Zent v. Murrow*, 476 S.W.2d 875, 880 (Tex.Civ.App.1972, no writ). Among the factors to be considered are the number, nature and severity of the existing violations, any prior acts of enforcement, and whether it is still possible to realize to a substantial degree the benefits sought to be obtained by way of the covenants. *Finkelstein v. Southampton Civic Club*, 675 S.W.2d 271, 278 (Tex.App. 1984, writ ref'd n.r.e.); *New Jerusalem Baptist Church, Inc. v. City of Houston*, 598 S.W.2d 666, 669 (Tex.Civ.App.1980, no writ). The failure to object to trivial violations does not preclude enforcement of the covenants. *Cowling v. Colligan*, 158 Tex. 458, 312 S.W.2d 943, 946 (1958); *Stewart v. Welsh*, 142 Tex. 314, 178 S.W.2d 506, 508 (1944).

■ In support of his argument that the evidence establishes, by the great weight

and preponderance or as a matter of law, that the mobile-home restrictions have been waived, Dempsey lists approximately eleven mobile homes which have been tolerated by the property owners in violation of the restrictive covenants. It is not entirely clear that all of those are on non-mobile home lots and it appears that several of the owners were joined with Dempsey in the lawsuit which is the subject of this appeal. Even giving Dempsey the benefit of the doubt, however, we still find the evidence of violations insufficient to establish waiver as a matter of law. The subdivision consists of approximately 2,460 lots, of which only about 425 had been improved as of the date of trial. Allowing non-conforming uses on eleven of 2,460 lots would not, as a matter of law, lead the "average man" to reasonably conclude the restrictions had been abandoned; nor do the existing violations, as a matter of law, preclude the property owners from realizing to a substantial degree the benefits intended through the covenants. Furthermore, we cannot say the jury's finding that the covenants had not been waived is against the great weight and preponderance of the evidence. *See Stephenson v. Perlitz*, 537 S.W.2d 287 (Tex.Civ.App.1976, writ ref'd n.r.e.); *Ortiz v. Jeter*, 479 S.W.2d 752 (Tex. Civ.App.1972, writ ref'd n.r.e.); *Scott v. Rheudasil*, 614 S.W.2d 626 (Tex.Civ.App. 1981, no writ); *Hemphill v. Cayce*, 197 S.W.2d 137 (Tex.Civ.App.1946, no writ).

## ESTOPPEL

In order for Dempsey to establish the defense of estoppel, the evidence must show deception by the property owners. *Estate of Blardone v. McConnico*, 604 S.W.2d 278, 282 (Tex.Civ.App.), *writ ref'd n.r.e. per curiam*, 608 S.W.2d 618 (Tex. 1980). The following elements must be established: (1) false representation or concealment of material facts; (2) made with actual or constructive knowledge of the facts; (3) to a party without knowledge or the means to obtain knowledge of the real facts; (4) made with the intention that such misrepresentation or concealment should be acted upon; and (5) the party to whom it was made must have relied upon or acted

upon it to his prejudice. *Id.* at 282; *Gulbenkian v. Penn*, 151 Tex. 412, 252 S.W.2d 929, 932 (1952). The party relying upon estoppel has the burden of proof, and the failure to prove any one element is fatal. *Barfield v. Howard M. Smith Company*, 426 S.W.2d 834, 838 (Tex.1968); *Concord Oil Co. v. Alco Oil and Gas Corp.*, 387 S.W.2d 635, 639 (Tex.1965).

■ Dempsey had actual or constructive notice of the restrictive covenants, which had been on file since at least 1972, before he purchased any property in Apache Shores. There is additional evidence that Dempsey had actual notice of the covenants before he purchased many of the Apache Shores lots. His argument seems to be that because the property owners failed to object at the slide show presented by Dempsey's representatives, it was reasonable for Dempsey to assume that the property owners would not enforce the covenants. There is no evidence, however, that Dempsey sought an express waiver by the Property Owners Association of its right to enforce the covenants, and property owners testified they assumed Dempsey was going to place mobile homes only on lots where mobile homes were permitted. There is further evidence the property owners provided Dempsey's representative a copy of the restrictive covenants at the board meeting and were assured by the representative that Dempsey would comply with the covenants. We find no evidence of deception by the Property Owners Association. Alternatively, we find the jury's answer to special issue number eight is not factually insufficient.

Dempsey argues, however, that the Property Owners Association had a "duty to speak" and its failure to do so gave rise to the defenses of waiver and estoppel. In a separate point of error, Dempsey argues the defense of laches. We will incorporate Dempsey's "duty to speak" argument into our discussion of laches.

## LACHES

For the defense of laches to arise, there must be delay on the part of the complaining party which results in injury to the defendant. *Culver v. Pickens*, 142 Tex. 87, 176 S.W.2d 167, 170–71 (1943); *Keene v. Reed*, 340 S.W.2d 859 (Tex.Civ.App.1960, writ ref'd). The burden of proof to establish the defense of laches is on the defendant. *Lee v. Powers*, 446 S.W.2d 938, 939 (Tex.Civ.App.1969, no writ).

Dempsey argues that delay on the part of the property owners association began in 1982 when Hudspeth, another property owner and co-defendant with Dempsey in the suit below, installed a mobile home in the subdivision without complaint by the property owners. Dempsey, however, is not entitled to rely for purposes of laches on the Property Owners Association's delay with respect to Hudspeth. The property owners' acquiescence in Hudspeth's mobile home is some evidence that the property owners may have *waived* the restrictions, but it is irrelevant to Dempsey's defense of laches.[2]

■ To carry his burden, Dempsey must prove the delay by the property owners was unreasonable in the face of actions taken by Dempsey himself. As stated above, suit was filed on July 25, 1984. Dempsey claims the property owners knew

---

**2.** The jury found the property owners had unreasonably delayed in taking action against Hudspeth. Accordingly, no judgment was rendered against him. Special issues Numbers 6 and 6A and the jury's response thereto are as follows:

> Do you find from a preponderance of the evidence that Apache Shores Property Owners Association, Inc. unreasonably delayed taking action against any of the defendants named below after acquiring knowledge of the defendant's actions or intentions to place the structures they have placed or intend to place on lots in the subdivision?
>
> \* \* \* \* \* \*

Mr. Hudspeth: We do

  \* \* \* \* \* \*

Mr. Dempsey and/or Village Homes, Inc.: We do not

  \* \* \* \* \* \*

Do you find from a preponderance of the evidence that any of the defendants in good faith changed their condition to his or her or its detriment because of any such delay?

  \* \* \* \* \* \*

Mr. Hudspeth: We do

  \* \* \* \* \* \*

Mr. Dempsey and/or Village Homes, Inc.: We do not

that he intended to place mobile homes in the subdivision in October 1983 when Dempsey's representative presented a slide show at the directors meeting. The property owners claim Dempsey's representative promised at the meeting that Dempsey would abide by the restrictive covenants, and they assumed the mobile homes would be placed only upon lots where mobile homes are permitted. There is evidence the property owners did not have knowledge that Dempsey intended to violate the restrictive covenants until April or May of 1984, only two months before filing suit. We find the evidence both legally and factually sufficient to support the jury's findings that the property owners did not unreasonably delay enforcing the restrictions as to Dempsey, and Dempsey did not detrimentally rely upon such delay.

## CHANGED CONDITIONS

Dempsey finally argues the restrictions against mobile homes in the Apache Shores subdivision are unenforceable because of changed conditions. The changed conditions to which Dempsey refers are changes in the mobile home industry, to wit, increased regulation and improvements in appearance and construction quality of mobile homes. These are the same arguments Dempsey raised under points of error one, two and four, and are not appropriate for a changed conditions defense. Changed conditions must involve changes in the restricted area or the immediately surrounding area so that it is no longer possible to secure to a substantial degree the benefits sought to be realized through the covenant. *Cowling v. Colligan, supra; Ortiz v. Jeter, supra.* Dempsey has cited no cases, and we find none, applying the changed conditions defense to circumstances such as Dempsey argues here. We overrule this point of error.

We have considered the remaining arguments raised by Dempsey and find them to be without merit. The judgment of the district court is affirmed.